

**SIGNED this 22nd day of May, 2008.**

```
                          _____
                                 FRANK R. MONROE
                          UNITED STATES BANKRUPTCY JUDGE
```
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| IN RE: | X | CASE NO. 07-60831 FRM |
| FRANK HENRY FEHMEL | X | |
| SHARON LEE FEHMEL | X | CHAPTER 7 |
| | X | |
| DEBTORS | X | |
| | X | |

MEMORANDUM OPINION

    This Court held a hearing on January 9, 2008 with regard to Union State Bank's Objection to Debtors' Claim of Exemptions. Texas Star Bank, S.S.B. and Curtis Durham, both creditors of the Debtors, and the Chapter 7 Trustee joined in Union State Bank's Objection. This Court has jurisdiction under 28 U.S.C. §1334(a), (b) and (d), 28 U.S.C. §151, 28 U.S.C. §157(a) and (b)(1), and the Standing Order of Reference in the District. This is a core proceeding under 28 U.S.C. §157(b)(2)(B) as it is a question of whether certain property should be exempted from the estate and whether the homestead exemption should be limited pursuant to §522(o) and (p) of the Bankruptcy

1

Code. It is, therefore, a proceeding arising under Title 11. This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052 which is made applicable to contested matters under Bankruptcy Rule 9014. Although three creditors and the Chapter 7 Trustee objected, Union State Bank filed the post hearing brief.

## Setting the Stage

Frank Henry Fehmel and Sharon Lee Fehmel (the "Debtors") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on August 28, 2007. The Debtors filed their Schedules and Statement of Financial Affairs also on August 28, 2007. Although the Schedules and SOFA have been amended several times, the Debtors have not amended their exemptions. Union State Bank timely filed its Objection to Exemptions on December 5, 2007. The Chapter 7 Trustee joined in this Objection on December 7, 2007. Texas Star Bank joined December 14, 2007 and Curtis Durham on December 21, 2007.

Debtors operated a wholly owned subchapter S corporation known as Central Texas Precision ("CTP"). CTP performed various contracting jobs. CTP obtained a construction contract with Fort Hood to repair and renovate various buildings on site. This contract was very lucrative for CTP and it posted a nice profit in 2005. However, a second contract with Ft. Hood was not as lucrative and CTP lost money over the following year. CTP ceased operations in February, 2007 as it did not have sufficient contracting jobs to operate. While in operation, CTP had two lines of credit with Union State Bank, one for $150,000.00 and the other for $80,000.00.

The Debtors owned a prior residence located at 327 CR 3343, Kempner, Texas which was purchased more than 1,215 days prior to their filing for bankruptcy. On May 4, 2005, which was within 1,215 days prior to their bankruptcy filing, the Debtors purchased another property located

2

at BCR 224, Lampasas, Texas 76550. The purchase price for this property was $375,000.00. On May 4, 2005 the Debtors caused CTP to draw down on its line of credit with Union State Bank the amount of $73,841.23. The Debtors used these non-exempt funds as the down payment on the Lampasas property. A cashier's check was issued to County Land Title in the amount of $73,841.23. Union State Bank issued the cashier's check, and an officer of Union State Bank executed the check. The Debtors took out a loan from Texas Land Bank in the amount of $304,000 to finance the remaining purchase price of the property.

      Mr. Fehmel testified that Union State Bank generally encouraged him to use his line of credit for the business, but that he did not obtain specific permission from Union State Bank to use the line of credit for the down payment for his new homestead. Both the Debtors' prior and current loan officers testified that the corporate line of credit was to be used solely for business purposes, and that they would not have approved using the corporate line of credit to invest in exempt real estate. However, the loan documents did not specifically prohibit such a use and no other written prohibition of such use was produced. Basically, both officers' testified it was just an understanding. The first loan officer on the CTP account, Mr. Whitson, testified that CTP was a good customer and that he encouraged CTP to use its line of credit to build a good loan history with Union State Bank. In addition, when Mr. Whitson left Union State Bank to work for Texas Star Bank in late 2005, he solicited additional business from CTP for Texas Star Bank. Texas Star Bank loaned CTP $150,000.00 around early 2006. Mr. Walker replaced Mr. Whitson as CTP's loan officer at Union State Bank. Mr. Walker testified that he renewed CTP's loan once prior to CTP defaulting.

      CTP's bank account exceeded $400,000.00 before and after the $73,841.23 transaction in question. And, prior to all the transactions in question, CTP owed the Debtors $130,000.00 for tools

and equipment they had transferred to CTP at or near its incorporation in 2004. Mr. Fehlmel testified that CTP's loan balance at Union State Bank was reduced to zero or nearly zero at least one time after the transaction in question and before the end of 2005. This testimony was not refuted.

CTP exhibited excellent financial condition during all of 2005. During the time of the transaction in question, CTP was working on numerous projects, including the $4,000,000.00 contract at Fort Hood which was very profitable. CTP's 2005 income tax return reflected net income of $16,591.00 after paying salaries of $94,112.00 to the Debtors. The tax return also indicated $51,393.00 in depreciation yielding a total positive cash flow of $162,096.00. The Debtors were quite optimistic and expected the prosperity of CTP to continue.

The Debtors moved into the Lampasas property prior to the sale of the Kempner property. The Kempner property was sold on August 12, 2005. The Debtors received $86,200.60 in proceeds from that sale. These funds were deposited first into the Debtors' personal account and then into the account of CTP where they were commingled with other corporate funds. Mr. Fehmel testified that since he had used CTP's funds to make the down payment on the Lampasas property, he placed the $86,200.60 into CTP's account.

The Debtors made substantial improvements to the Lampasas property. The Debtors extensively remodeled the main house after purchase. They also built a 50' x 50' barn, a 620 sq. ft. enclosed workshop and an 1,100 sq. ft. guest apartment with full kitchen and bath. The Debtors paid approximately $150,000.00 and traded a tractor to Curtis Durham to provide most of the improvements. Mr. Durham has also filed a claim in this case alleging that he is owed an additional $42,830.87. The Debtors also made other improvements themselves, including $8,000.00 to $10,000.00 worth of plumbing work. The Debtors claim that the $86,200.60 from the proceeds of

4

their Kempner house was paid out of CTP's account for some of the improvements to the Lampasas property. However, they did not directly trace these funds through the corporate account into their home.

Prior to bankruptcy, the Debtors were offered approximately $740,000.00 for the property and certain items of personal property. Mr. Fehmel testified that in his opinion, the value of the property without the personal property was $700,000.00. In their schedules, the Debtors valued the Lampasas property at $700,000.00 and listed a mortgage to the Federal Land Bank in the amount of $297,811.30. None of the parties presented any evidence on whether the appreciation of the property since the purchase was due to the improvements, to market conditions, or both.

Union State Bank claims that the Debtors' homestead exemption should be limited pursuant to §522(p) of the Bankruptcy Code as the Debtors acquired their homestead in approximately May, 2005 which was within 1,215 days of their bankruptcy filing.

Union State Bank further claims that whatever exemption amount is allowed under §522(p), it should be reduced by $73,841.23, the amount the Debtors drew down on CTP's loan with Union State Bank to use as the down payment on the homestead in Lampasas because such nonexempt funds were put into the homestead. *See,* 11 U.S.C. §522(o).

Debtors claim they did not intentionally hinder, delay or defraud Union State Bank by using the funds from CTP. In addition, they urge that the proceeds from their prior residence should be used to increase the cap along with the money used for improvements to the property. Likewise, Debtors urge that any additional appreciation should be added to the cap.

The Debtors also claimed $10,570.00 in property listed as tools of the trade or business. Mr. Fehmel is a full-time employee of Guyco, Inc., an engineering concern in Lampasas, Texas. He

claims he is also engaged in the farming and ranching business on his homestead in Lampasas County which consists of approximately 121 acres. In addition, the Debtor does odd jobs on a fee-paid basis and maintains a small gunsmithing operation on his property. The Debtor claims to utilize all of the items claimed as exempt pursuant to §42.002(a)(4) of the Texas Property Code in the prosecution of these endeavors.

However, Mr. Fehmel testified that prior to the bankruptcy, he practiced his trade or profession through his corporation. Income from this source is reflected on the 2005 income tax return of CTP. Fehmel Exhibit 1. However, it shows only $1,792.00 from cattle and no income for gunsmithing. The items claimed as exempt consist of equipment such as lathes, welding equipment, benches, power tools and trailers. CTP ceased operations in February 2007. Mr. Fehmel testified that he was too focused on preparing for his bankruptcy to engage in a trade or profession at that time. Mr. Fehmel did not have a trade or profession in his own name at any time prior to the filing of the bankruptcy and was not using the equipment in a trade or profession on the petition date. His Statement of Financial Affairs does not disclose any income from these sources. Union State Bank claims that Mr. Fehmel does not operate a trade or business. Instead, he is an employee of Guyco, Inc. Mr Fehmel testified that he does not use the tools in his employment with Guyco, Inc. Mr. Fehmel testified that he sold his cattle prior to bankruptcy, but that two goats and two horses remained on the Debtors' property. He also indicated that he had used the tools to repair some fencing as well as to repair a grain auger after the filing of the bankruptcy.

## Legal Issues

1. Can the Debtors exempt the $10,750.00 worth of property as tools of a trade or business?
2. Should the homestead exemption amount be reduced due to the limitations imposed by

11 U.S.C. §522(o)?

3. Should the homestead exemption amount be reduced due to the limitations imposed by 11 U.S.C.§522(p)?

4. May the Debtors roll over proceeds from the sale of their former homestead to their new homestead when such proceeds were first deposited into a corporate bank account and then only used to pay for improvements on the new homestead?

3. Should appreciation, by improvements or otherwise, effect the limitations imposed by 11 U.S.C. §522(p).

Conclusions of Law

According to Union State Bank, et. al., the Debtors are unable to avail themselves of the "tools of the trade" exemption as neither Debtor uses the tools in an actual trade or business. The burden is on Union State Bank to prove this objection.

Texas law allows an exemption for "tools, equipment, books, and apparatus, including boats and motor vehicles used in a trade or profession valued at $10,750.00." Tex. Prop. Code §42.002(a)(4). There are three (3) requirements necessary to obtain the exemption under §42.002(a)(4). First, the items in question must qualify as "tools, equipment, books, apparatus, boats or motor vehicles." See *In re White,* 234 B.r. 388 (Bankr. W.D. Tex. 1999)(computer software was not a tool of the trade). There is no dispute that this requirement was met.

Second, the Debtor must actually be engaged in a trade or profession. The term "trade or profession" is construed to mean "any legitimate self-employment as opposed to "an historic craft performed by an artisan using distinctive tools." *In re Legg,* 164 B.R. 69 (Bankr. N.D. Tex. 1994); see also, *In re Erwin,* 199 B.R. 628 (Bankr. S.D. Tex. 1996)(Harris County constable not self-

7

employed.)

Finally, the tools must actually be used in the trade. See *P.J. Willis & Bro. v. Morris,* 1 S.W. 799, 802-03 (Tex. 1886)(Court found that individual had ceased altogether to work at his trade, and at the time of the levy was giving his time and attention to the mercantile business of the firm. There was no evidence that the arrangement was temporary, and therefore he must be held to have permanently abandoned his trade.)

More recently, a court has stated:

> In Texas, an item may be claimed as an exempt tool of trade, if, among other things, the item is "fairly belonging to or usable in the debtor's trade." (Citation omitted). This determination involves the consideration of whether the item is used with sufficient regularity to indicate an actual use by the debtor. (Citation omitted). This "use test" seeks to ensure that the item sought to be exempted is "used" in the trade, as required by the statute.

*In re White, supra*, at 389.

Although Mr. Fehmel claims to have done some odd jobs subsequent to bankruptcy, exemptions are determined based upon facts existing on the petition date. *Matter of Zibman,* 268 F.3d 298 (5th Cir. 2001).

The Debtors did not report any income from a trade or profession on their Statement of Financial Affairs or Form B-22A. The Debtors claimed to have used the equipment in connection with CTP prior to bankruptcy. Mr. Fehmel testified that he used the equipment to perform gunsmithing, to aid in his ranching operation, and to do iron work. CTP ceased doing business in February 2007 approximately 6 months prior to the Debtors filing for bankruptcy. The Debtors sold their cattle in April, 2007 although they did retain two horses and two goats. Mr. Fehlmel testified that he was too busy preparing for his bankruptcy to engage in a trade or profession during the period

8

from when CTP closed until the filing of the bankruptcy although he claims to have done some odd jobs and to have made repairs on his homestead subsequent to the filing. On the petition date, Mr. Fehmel was an employee of Guyco, Inc. It appears that the Debtors fail to satisfy the second and third requirement. The exemption is disallowed.

Limitations on Homestead Exemption

Section 522(o) and (p) impose limitations on the extent of a debtor's homestead exemption.

Section 522(o) provides that the value of an interest in a homestead "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt under subsection (b), if on such date the debtor had held the property so disposed of." 11 U.S.C. §522(o)(West 2007).

Section 522 (p) provides that a debtor may not exempt "any amount of interest that was acquired by the debtor during the 1,215-day period preceding the date of the filing of the petition that exceeds $125,000.00 in value" in the debtor's homestead. 11 U.S.C. §522(p)(West 2007). The limitation does not apply to "any interest transferred from a debtor's previous principal residence (which was acquired prior to the beginning of such 1,215-day period) into the debtor's current principal residence, if the debtor's previous and current residences are located in the same state." *Id.* This case was commenced August 28, 2007. As such, the dollar amount of the cap is actually $136,875.00 instead of $125,000.00. Pursuant to 11 U.S.C. §104(b), the amount is adjusted every three years beginning April 1, 1998 to account for changes in the cost of living. For cases commenced before April 1, 2007, the limit is $125,000.00, after $136,875.00.

Section 522(m) applies separately with respect to each debtor in a joint case. Union State Bank has conceded this point. Several courts have determined this as well. *In re Rasmussen,* 349 B.R. 747 (Bankr. M.D. Fla. 2006); *In re Chouinard,* 358 B.R. 814 (Bankr. M.D. Fla. 2006); and *In re Limperis*, 370 B.R. 859 (Bankr. S.D. Fla. 2007). Therefore, any exemption amount under §522(p) will be capped at $273,750.00 ( $136,875 x 2) if such applies.

The two limitations were added by the Bankuptcy Abuse Prevention and Consumer Protection Act of 2005 to strike a balance between the rights of debtors and creditors in states with unlimited homestead exemptions such as Texas. The statutes establish two different periods of time with different standards for limiting the homestead exemption. Under §522(p) if the homestead is acquired during the 1,215 day period prior to bankruptcy, a creditor is not required to prove bad intent on the debtor's part, while the debtor is guaranteed the specific exemption plus amounts transferred from a prior homestead to the exempt homestead claimed in the bankruptcy. This is basically a no-fault provision which adjusts the equities between the parties by allowing the debtor a generous but not palatial estate. See *In re Presto,* 376 B.R. 554 (Bankr. S.D. Tex. 2007)(Section 522(p) does not require a finding of misconduct or fraudulent intent by the debtor).

In addition to the 1,215 day no-fault provision, there is also a 10 year look back for fraud under §522(o). This evidences a policy that abusive pre-bankruptcy planning will not be tolerated at the expense of creditors.

§522(o)--- Intent to Hinder Delay or Defraud

To prevail under §522(o), four elements must be proven: (1) the debtor disposed of property within 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a

new homestead, or reduce the debt associated with an existing homestead, improve an existing homestead, or alternatively, to buy a new principal residence used by dependents of the debtor; or reduce the debt associated with a principal residence used by dependents of the debtor; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor.

These Debtors did dispose of nonexempt property in the form of loan proceeds drawn from CTP's line of credit within ten years prior to bankruptcy. These funds, in the amount of $73,841.23, were used as the down payment for the homestead in Lampasas. The funds were nonexempt property as they were cash.

Union State Bank claims that the transaction was performed with intent to hinder, delay or defraud the Debtors' creditors. CTP had a line of credit for the purpose of funding job-related expenses. The Debtors withdrew funds from this corporate line of credit to make the down payment on their personal residence. The two bank officers that testified said this was not a proper use of the line of credit, and they would not have authorized borrowing for this purpose.

The Debtors attempted to justify this transfer of corporate assets to their personal benefit on two grounds. First, Mr. Fehmel testified that Union State Bank encouraged him to use the line of credit. However, he admitted that he did not obtain specific permission to use the line of credit for this purpose. He also sought to justify the transfer of corporate assets into his personal name based on advice from his CPA with respect to loans the debtors made to CTP. However, the 2005 tax return for CTP, which was prepared by the same accountant, did not reflect any loans to shareholders, either at the beginning of the year or at the end of the year. Mr. Fehmel claims that his accountant actually posted this loan under mortgages and notes payable as opposed to shareholder loans.

Union State Bank claims that the very nature of this transaction allows the Court to infer an intent to hinder, delay or defraud because regardless of how well CTP's financial situation was at the time, the Debtors were not entitled to use its loan to CTP as their personal checkbook. If the Debtors wanted to borrow money for personal purposes, they should have done so honestly in their own name. Union State Bank therefore asserts that by using funds from CTP, the Debtors have demonstrated their intent, and the Debtors' exemption should be reduced by $73,841.23.

The phrase "with the intent to hinder, delay or defraud a creditor" contained in §522(o) is a term that is not defined in the Bankruptcy Code. Section 727(a)(2) of the Code also contains the phrase and §548(a)(1)(A) contains very similar language. Therefore, in interpreting the meaning of the phrase as contained in §522(o), it is appropriate to look to case law interpreting these other two statutes. *In re Agnew,* 355 B.R. at 284 (Bankr. D. Kan. 2006) ; *In re Lacounte,* 342 B.R. at 814 (Bankr D. Mont. 2005) ; *In re Maronde,* 332 B.R. at 599( Bankr. D. Minn. 2005).

Proving a debtor's "actual intent to hinder, delay or defraud" under §§727 and 548 by evidence of wrongful intent is rarely done by direct testimony, but rather is typically established by inference from specific indicia of fraud based upon all of the facts and circumstances. *Agnew,* 355 B.R.276 at 284-85; *Lacounte,* 342 B.R.809 at 815; *Maronde,* 332 B.R.593 at 600. These courts have turned to the fraudulent transfer acts of their respective states as a starting point for examining indicia -sometimes referred to as badges of fraud.

The Texas Uniform Fraudulent Transfer Act (TUFTA), TEX. BUS. & COM. CODE. ANN. §24.001 *et. seq. (*Vernon 2008 )lists certain badges to be considered. Because this list is non-exhaustive, this Court will also look to others, if necessary, focused on by other bankruptcy courts that have interpreted §522(o). The indicia are as follows:

12

1. The transfer or obligation was to an insider. TEX. BUS. & COM. CODE. ANN. §24.005(b)(1)---- Yes. The Debtors transferred the nonexempt cash to their personal residence which they owned.

2. The debtor retained possession or control of the property after the transfer. TEX. BUS. & COM. CODE. ANN. §24.005(b)(2)—Yes. The Debtors retained the proceeds in their personal residence as the proceeds were used as a down payment.

3. The transfer or obligation was concealed. TEX. BUS. & COM. CODE. ANN. §24.005(b)(4)— No. Debtors withdrew the funds from their corporate account with Union State Bank. In fact, Union State Bank issued the $73,841.23 cashier's check and a loan officer executed same. The transaction was not concealed.

4. Before the transfer was made, the debtor had been sued or threatened with suit. TEX. BUS. & COM. CODE. ANN. §24.005(b)(4)-No-The Debtors had not been sued or threatened with suit. In fact, Texas Star Bank was recruiting the Debtors' corporation as a customer, and Union State Bank indicated it wanted Debtors'corporation to remain a customer.

5. The transfer was of substantially all of the debtor's assets. TEX. BUS. & COM. CODE. ANN. §24.005(b)(5)– No. The transfer was not substantially all of the Debtors' assets. At the time of the transfer the Debtors owned CTP which was financially sound and had other assets. CTP's bank account reflected $400,000.00 in cash at the time of the transaction. The Debtors owned another home which was sold soon after the transaction in question in which they obtained proceeds of $86,200.60 which they proceeded to deposit in CTP's bank account.

6. The debtor absconded-i.e., avoided service of process and/or concealed himself. TEX. BUS. & COM. CODE. ANN. §24.005(b)(6)-No

7. The debtor removed or concealed assets. TEX. BUS. & COM. CODE. ANN. §24.005(b)(7).–No.

8. The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. TEX. BUS. & COM. CODE. ANN. §24.005(b)(8)–No–The Debtors used the cash to make a down payment on a home. The cash paid equaled the down payment amount.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. TEX. BUS. & COM. CODE. ANN. §24.005(b)(9)–No, CTP was financially sound the year the transaction occurred. It met with difficulty in 2006 when certain contracts that it expected from Fort Hood did not occur as planned. CTP did not cease operations until 2007, and the Debtors did not file for bankruptcy until later in 2007. The Debtors also did not appear to be insolvent at the time of the transaction.

10. The transfer occurred shortly before or after a substantial debt was incurred. TEX. BUS. & COM. CODE. ANN. §24.005(b)(10)–No, CTP borrowed the money from Union State Bank in 2004.

13

The following year CTP's financial condition was stable, and at one point after the transaction, the bank balance reflected $400,000.00. Mr. Fehmel testified that he caused CTP to reduce its line of credit to zero or close to zero at least once after he used the $73,841.23 to make the down payment on the home. And, when the Debtors sold their other home, they deposited the $86,200.60 back into CTP's bank account.

11. The transfer was done just prior to the filing of the debtor's bankruptcy. *Lacounte,* 342 B.R. at 816----No. The transfer was made in May of 2005. The Debtors did not file bankruptcy until August of 2007, and CTP did not cease operations until early 2007.

12. The debtor is unable to explain the disappearance of assets. *Id.* at 815----No. All assets are accounted for.

13. The debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy.[1] *Agnew*, 355 B.R. at 285.—No. There was no pattern of "sharp dealing" prior to bankruptcy. The Court cannot say that taking funds from a corporate account is prudent, but in this situation the Court cannot say it was a devious or unethical action.

Based on the foregoing, the Court finds the Debtors did not have actual intent to hinder, delay or defraud their creditors by using CTP loan proceeds to make the down payment on their homestead in Lampasas. Union State Bank's objection under §522(o) is overruled.

§522(p)-Transfers Within 1,215 days Prior to Filing

11 U.S.C. §522(p) states, in pertinent part:

(1) Except as provided in paragraph (2) of this subsection and §§544 and 548, as a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of interest that was acquired by the debtor during the 1,215-day period preceding the date of the filing of the petition that exceeds in the aggregate $136,875.00 in value-

(D) real or personal property that the debtor or dependent of the debtor claims as a homestead.

(2)(B) For purposes of paragraph (1), any amount of such interest does not include any interest transferred from a debtor's previous principal residence (which was acquired prior to the beginning of such 1,215-day period) into the debtor's current principal residence, if

---

[1] One court has defined "sharp dealing" to mean "unethical action and trickery." *In re Sissom,* 366 B.R. at 700, n. 34. (Bankr. S.D. Tex. 2007).

14

the debtor's previous and current residences are located in the same State. 11 U.S.C. §522(p) (West 2008).

With respect to §522(p), it is Union State Bank's burden of production to establish there was "an interest that was acquired by the debtor during the 1,215-day period preceding the date of the petition." It is undisputed that the Debtors acquired the Lampasas property within 1,215 days of filing for bankruptcy. The Debtors claim now that they are entitled to add their rollover equity of $86,200.60 which they received from the sale of their prior residence and eventually used to renovate their new residence as well as any increase in value of the property as a result of the improvements they made to the property as well as any passive appreciation during the 1,215 day period.

Rollover Equity

Union State Bank claims that the Debtors are not entitled to add the amount allegedly transferred from the prior residence. The Debtor has the burden to show that an interest was "transferred from a debtor's previous principal residence. . .into the debtor's current principal residence." Here, the Debtors purchased the Lampasas property on May 4, 2005 with the intention that it be there homestead. Their prior homestead was not sold until August 12, 2005. The proceeds from that sale were not placed directly into the new homestead, but were first deposited into the Debtors' personal bank account and then deposited in CTP's corporate bank account. Although the Debtors claim those proceeds were ultimately used to make improvements to the new homestead, there is no "tracing" evidence in the record to substantiate that claim. For all we know the funds in the CTP account could have gone to zero and back up again before any were used on the new homestead.

When the Debtors deposited the funds realized from the sale of their homestead three months after they acquired their new one into the CTP corporate bank account, they commingled them with the other funds of CTP. As such, the funds lost their identity as homestead proceeds. And, the Debtors failed to trace the funds from the sale of the first home through CTP's account and into the improvements of their new homestead. If funds from the CTP account were in fact used to make improvements to the house, there is no way to know whether the specific funds used from the corporate account were the same funds received from the sale of the prior house. The testimony indicated that improvements were made over a period of months. As a result, it is unlikely that there was an identity between the funds originally deposited and those paid out.

Under Texas law, all of the equity transferred from a prior homestead into a current homestead maintains its exempt status. Texas law provides a six-month window during which proceeds from the sale of a homestead continue to be exempt despite not being invested in any homestead. TEX. PROP. CODE ANN. §41.001(c) (Vernon 2008). The policy behind the statute is to protect homestead equity so that it may be reinvested into another homestead. *In re Zibman,* 268 F.3d 298, 305 (5th Cir. 2001).

Here, the Debtor purchased his second residence prior to selling the first residence, so none of the proceeds of the prior residence were used for the purchase of the second. The Debtors then placed the proceeds from the sale of their prior homestead into CTP's bank account where the funds were commingled with other funds. It is horn book law that, "[i]f the debtor purchases a new homestead, any remaining proceeds from the sale of the first homestead are instantly rendered non-exempt." *In re Davis,* 170 F.3d 475 (5th Cir. 1999); see also *In re England,* 975 F.2d 1168, 1174 (5th Cir. 1992)("the acquisition of another homestead during the six month period instantly changes the

prior homestead to former homestead and deactivates the proceeds exemption statute such that the proceeds of the former homestead are no longer exempt."). When the Debtors purchased the Lampasas property prior to selling their first homestead and rolling over those proceeds at closing, any proceeds from the sale of the first homestead were rendered nonexempt.

For both reasons set forth above, the Debtors have failed in their burden to show they are entitled to relief under §522(p)(2)(B).

Appreciation

Debtors claim that any appreciation from improvements or otherwise should be added to the exemption cap. It is, however, without dispute that the Debtors acquired their full ownership "interest" in the Lampasas property within 1,215 days of filing for bankruptcy.

Courts have differing opinions as to what it means to acquire an interest in property. One line of cases holds that it refers to acquiring title/ purchasing the interest within the 1,215-day period and would basically include any equity accumulated. *In re Anderson,* 374 B.R. 848 (Bankr. D. Kan. 2007); *In re Blair*, 334 B.R. 374 (Bankr. N.D. Tex. 2005); *In re Sainler,* 344 B.R. 669 (Bankr. M.D. Fla. 2006). Other cases hold that the any amount of equity appreciation acquired by the debtor during the 1,215-day period would not fall within the limitation. *In re Rasmussen,* 349 B.R. 747 (Bankr. M.D. Fla. 2006); *In re Chouinard,* 358 B.R. 814 (Bankr. M.D. Fla. 2006). The Fifth Circuit has yet to take a side in the title versus equity debate, but has ruled that when a previously owned home becomes a homestead within the 1,215-day period that this change in status does not trigger §522(p)(1). *Matter of Rogers,* 513 F.3d 212 (5th Cir. 2008).

Union State Bank claims the title theory makes more sense and is easier to apply. As noted by Judge Harlin Hale, "one does not actually 'acquire' equity in a home. One acquires title to a

17

home." *In re Blair* at 376. The court in *Sainler* focused on the meaning of the word "acquire."

> The word acquired is not a term of art in the law of property but one in common use. The plain import of the word is 'obtained as one's own.' Black's Law Dictionary set forth 'acquire' means: 'to gain possession or control of; to get or obtain.' 'Interest' is defined as 'a legal share in something; all or part of a legal or equitable claim to or right in property.' Title to real property is acquired, equity is not. Equity is the difference between value and debt. It is not a constant, but fluctuates based upon market conditions and when mortgage principal is paid. A debtor who holds title to property obtained that property as the debtor's own. The debtor's interest in the property is his legal right in the property.

*Sainler* at 672-73.

The title theory allows a court to focus on when the debtor acquired its interest in the property as opposed to the potential myriad of points in time which equity increased in value. It also avoids the incongruous result where property is acquired outside of the 1,215-day period but the exemption is limited based on equity accumulated during this period. The courts in *Blair, Sainler* and *Anderson* appear to be trying to avoid this result.

The title theory also conforms with the structure of §522. Section 522(d) contains a set of exemptions most of which are limited by dollar amount. If the debtor owns property worth more than the amount of the exemption, the excess portion is non-exempt regardless of how it was applied. Here, the statute provides that if the interest in property is acquired within 1,215 days, the exemption is limited to $136,875.00 per debtor. Once the value of the property exceeds the cap, the excess logically belongs to the estate; whether the equity increased due to improvements or passive appreciation.

While the Fifth Circuit did not resolve the title versus equity split, its rationale is instructive. According to the Fifth Circuit, the debtor does not acquire an interest when property is designated as homestead. "Based on our review of the statutory language, we conclude that the term 'interest'

as used in §522(p)(1) refers to vested economic interests that the debtor acquires in the homestead property during the 1,215 day period preceding the filing of the petition. Thus, a homestead interest established within the statutory period, without more, does not fall within the purview of §522(p)(1)." *Matter of Rogers* at 27.

Title, unlike a designation of homestead, is clearly a vested economic interest. When a debtor acquires title, he acquires a vested economic interest in the property. If this occurs within the 1,215 days prior to the petition date, §522(p)(1) will be triggered. Once the section is triggered, the cap applies. The cap should be applied to the interest acquired during the 1,215 day period. The source of any increase in value is irrelevant. Congress provided that rollover equity would be added to the exemption cap. If Congress had meant to allow the increase in the equity obtained by improvements from market forces, or otherwise to also be added to the cap, it would have so provided in the statute.

Debtors are limited to the designated monetary cap under §522(p) of $273,750.00 plus any post-petition principal reduction to the mortgage.

### Conclusion

The creditors' and trustee's objection to the Debtors' tools of the trade is sustained. The creditors' and trustee's objection under §522(o) is overruled. The creditors' objection under §522(p) is sustained and the Debtors' homestead exemption is limited to $273,750.00 plus any principal reduction made by them post-petition.

###